[Cite as *J.P.C. v. S.T.C.*, 2026-Ohio-3021.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| J.P.C., | : | |
|     Plaintiff-Appellee/<br>    Cross-Appellant, | : | |
| | : | No.115734 |
| v. | | |
| | : | |
| S.T.C., | | |
|     Defendant-Appellant/<br>    Cross-Appellee. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** August 6, 2026

Civil Appeal from the Cuyahoga County Court of Common Pleas
Domestic Relations Division
Case No. DV-25-404458

### *Appearances:*

Stafford Cruz Law Company and Kelley R. Tauring, *for appellee/cross-appellant.*

Cavitch, Familo & Durkin Co., L.P.A., and Roger L. Kleinman, *for appellant/cross-appellee.*

LISA B. FORBES, J.:

{¶ 1} S.T.C. appeals from the judgment entry granting a domestic-violence civil-protection order ("DVCPO") concerning J.P.C. J.P.C. cross-appeals the

duration of the DVCPO and its designation of only her as a protected person. After a thorough review of the facts and the law, we affirm.

## I.    Facts and Procedural History

{¶ 2} On May 12, 2025, J.P.C. filed a petition for a DVCPO against S.T.C. in the Domestic Relations Division of the Cuyahoga County Court of Common Pleas ("Domestic Relations Court"), seeking protection for herself and her three minor children ("the Children"). J.P.C.'s petition noted that S.T.C. is her former spouse and the father of the Children.

{¶ 3} Also on May 12, 2025, the trial court held an ex parte hearing, at which S.T.C. was not present, regarding J.P.C.'s petition. That same day, the court issued an "order of protection," finding that J.P.C.

> gave testimony that support[ed] findings that [S.T.C.] committed domestic violence as defined by R.C. 3113.31(D)(1) and that [J.P.C] and/or [her] household members are in immediate and present danger of domestic violence. Petitioner's testimony is found to be credible, and immediate protection is necessary.

{¶ 4} The trial court scheduled a full hearing on the issues raised by J.P.C.'s petition, to take place on May 20, 2025. On May 20, 2025, the court issued a journal entry continuing the hearing to May 27, 2025. The entry noted that S.T.C. objected to the continuance of the hearing.

{¶ 5} On May 27, 2025, the case proceeded to a full hearing, at which both J.P.C. and S.T.C. were present. The parties elicited the following testimony.

**A. Hearing Testimony**

**1. S.T.C.**

{¶ 6} At the outset of the hearing, J.P.C. called S.T.C. to testify as if on cross-examination. S.T.C. testified that he and J.P.C. had previously been married and are the parents of the Children.

{¶ 7} On May 10, 2025, S.T.C. was driving his motorcycle in Brunswick, Ohio. S.T.C. turned right onto Pearl Road, at which point he observed J.P.C. sitting in the driver's seat of a car that was stopped in a turn lane. He pulled up to the driver's-side door of J.P.C.'s car and "yelled." He was speaking loudly because J.P.C.'s car window was closed and because he was on a motorcycle. He was "sad" that J.P.C. had arranged for the first communion of one of the Children, L.C., without inviting him.

{¶ 8} S.T.C. was aware that J.P.C. contacted law enforcement related to these events. S.T.C. gave a statement to Officer James Keaveney ("Ofc. Keaveney"). He agreed that he told Ofc. Keaveney that he "revved" his motorcycle's engine while alongside J.P.C.'s car. He testified that revving his engine was an easier way of getting J.P.C.'s attention than using his motorcycle's horn.

{¶ 9} Later that day, S.T.C. attended a soccer game in which he believed L.C. would be playing. L.C. was not there, so S.T.C. left the game early. He drove his motorcycle to his parents' house, which was "diagonal" from J.P.C.'s house. His parents were not home, and he left within an hour. He did not specifically recall

revving his motorcycle engine when arriving at or departing from his parents' house but testified that he "probably" had.

{¶ 10} S.T.C. denied scratching his motorcycle against J.P.C.'s car. He denied attempting to reach into the car through its driver's-side window, which he recalled had been rolled up from the time he first saw the car. He denied calling J.P.C. a "stupid f****** b****" or being "mad." He did not hear the Children or see whether the Children were in the car because it had "tinted windows." He denied that he was attempting to intimidate or scare J.P.C. when he revved his motorcycle's engine. He denied observing J.P.C. call 9-1-1 while he was next to her car. He denied completing a "U-turn" and following J.P.C.

{¶ 11} Regarding his prior marriage with J.P.C., S.T.C. agreed that he had created holes in the walls of their marital home. His testimony did not reveal how these holes came to be. He denied routinely throwing things at J.P.C. He agreed that he had discharged a firearm in the home in 2020 but maintained that he did so accidentally.

### 2. Officer James Keaveney

{¶ 12} Ofc. Keaveney testified that he worked for the Brunswick Police Department. On May 10, 2025, while on duty, he spoke with J.P.C., who told him that S.T.C. had "pulled up alongside of her in traffic and was yelling at her." According to Ofc. Keaveney, J.P.C. was upset and crying. Ofc. Keaveney observed "very small, either scratches or scuff marks, on the driver side of [J.P.C.'s] car that

she said could possibly be consistent with her ex-husband's motorcycle." He did not observe S.T.C. following J.P.C.

{¶ 13} Two days later, on May 12, 2025, Ofc. Keaveney spoke with S.T.C. about this incident. S.T.C. told Ofc. Keaveney that he had asked someone, presumably J.P.C., multiple times about when his son was going to make his first communion, which he eventually determined on his own. He also told Ofc. Keaveney that he was driving his motorcycle in the direction of the church at which he believed the first communion was occurring when he encountered J.P.C.

### 3. J.P.C.

{¶ 14} J.P.C. testified that, on May 10, 2025, after her son's first communion, she drove her Children from the church where the ceremony occurred, in the direction of a soccer game in which L.C. was supposed to play. While J.P.C. was stopped on Pearl Road, "suddenly, [S.T.C.] came up on his motorcycle." He pulled "right up to" the car's window. J.P.C. "felt . . . some impact on [her] vehicle." She later discovered a scratch on her car that had not been there before.

{¶ 15} When S.T.C. pulled up to J.P.C.'s car, her "window was down." S.T.C. "started reaching in" to the car, so she "quickly put the window up." She did not recall whether S.T.C.'s hand entered the car. S.T.C. started "pounding on the window" with a "clenched fist" maybe "two or three" times. At the same time, "obscenities were being sworn at me." The Children were "yelling and crying and screaming."

{¶ 16} J.P.C. called 9-1-1 and began driving to a police station. While doing so, she saw S.T.C. "making a left, getting through traffic," "appearing to either U-turn or pull into a business." While J.P.C. feared that S.T.C. was attempting to follow her, she did not testify that she saw his motorcycle proceed — in her direction or otherwise — after initiating this turn.

{¶ 17} At the police station, J.P.C. spoke to Ofc. Keaveney. She was scared for herself and for the safety of her children. She testified that the encounter was "terrifying," "unexpected," and that she "shook" for "three days after."

{¶ 18} On cross-examination, J.P.C. agreed that she did not tell S.T.C. when or where the first communion would occur. She agreed that S.T.C. did not verbally threaten her with physical violence or get off his motorcycle. She did not observe a weapon during her interaction with S.T.C. on Pearl Road. J.P.C. returned to her home on May 10, 2025, after which point S.T.C. did not interact with her.

{¶ 19} Regarding her prior marriage with S.T.C., J.P.C. testified that, in 2017, S.T.C. created a hole in the wall of their marital home. J.P.C.'s testimony was unclear as to how this happened. In 2020, while J.P.C. was upstairs in the home, she heard "a shot go off." She ran downstairs to S.T.C., who told her that he "accidentally discharged a firearm." In 2022, S.T.C. became "so enraged that he threw his phone at me and it went through the wall." Also in 2022, because L.C. "wasn't listening . . . [S.T.C.] began throwing objects at him on the couch." J.P.C. further testified that S.T.C. became "enraged," "ripped [L.C.] off the floor with one arm," and "was hitting [the child] in the head repeatedly."

### 4. Scott Taylor

{¶ 20} Scott Taylor testified that J.P.C. was his "significant other" at the time of this hearing. He was present on Pearl Road on May 10, 2025, during these events. He saw a "motorcyclist approach the driver side window" of J.P.C.'s car. The motorcyclist "struck the vehicle" and later "made a U-turn."

### 5. S.T.C.

{¶ 21} Near the conclusion of the hearing, S.T.C. testified for a second time, on his own behalf. According to S.T.C., he was driving on Pearl Road on May 10, 2025, because he was "trying to make it to the First Communion ceremony for my son." He "looked up and saw [J.P.C.'s] vehicle." His motorcycle was facing northbound and her vehicle was "a few feet" away, facing southbound.

{¶ 22} S.T.C. testified, "I came up to the vehicle, I revved my engine" and "yelled, Shame on you, b****." He denied coming in contact with the vehicle. This interaction lasted a "split second or two," after which J.P.C.'s car "began moving," and S.T.C. "proceed[ed] on my way." He later went to his parents' house. While there, he did not interact with J.P.C.

## B. Exclusion of GPS Evidence

{¶ 23} During S.T.C.'s testimony, his attorney attempted to introduce an exhibit described as a screenshot from a digital application that tracked S.T.C.'s location on May 10, 2025. Counsel for J.P.C. objected, arguing that S.T.C. could not authenticate the exhibit. The magistrate sustained the objection and excluded the

evidence.  Regarding this evidentiary ruling, the hearing transcript provides as follows:

> The Magistrate:  What is it that you're trying to show with this exhibit?
>
> Counsel for S.T.C.:  That he didn't turn around.  He went directly to the church.
>
> . . .
>
> The Magistrate:  Is this from that company that made this?
>
> Counsel for S.T.C.:  Can I lay a foundation, Your Honor?
>
> . . .
>
> The Magistrate:  You are not the company.  I don't even know what app this is.
>
> . . .
>
> The Magistrate:  I'm not allowing this.  He can testify that he did not turn around.

## C. Grant of DVCPO and Assignments of Error

{¶ 24} Following the full hearing, on May 28, 2025, the trial court issued an "order of protection," finding that J.P.C.

> proved by a preponderance of the evidence that [S.T.C.] engaged in domestic violence as defined by R.C. 3113.31 and that a [DVCPO] for one year protecting Petitioner only is appropriate.  The evidence presented for the other requested parties did not rise to the level of domestic violence as defined in R.C. 3113.31.

The DVCPO further provided, "[T]he terms of this Order shall be effective until 05/12/2026."

{¶ 25} Both parties filed objections, which covered all of the assignments of error now before us.  The trial court overruled both parties' objections via a

judgment entry issued on September 25, 2025, in which the court ordered that the DVCPO that had been issued on May 28, 2025, would remain in effect. Regarding the exclusion of GPS evidence, the court found that S.T.C. "did not present a witness to properly authenticate the GPS data he was seeking to introduce."

{¶ 26} S.T.C. appealed, raising the following assignments of error:

I. The trial court erred in finding Appellant committed an act of domestic violence where the finding was not supported by sufficient, credible evidence.

II. The trial court erred and abused its discretion by admitting testimony and exhibits regarding an alleged history of domestic violence.

III. The trial court abused its discretion and caused material prejudice by excluding authentication testimony regarding a GPS screenshot and by excluding the GPS screenshot as evidence.

IV. The Magistrate abused her discretion by granting J.P.C.'s oral motion for continuance of the full hearing where J.P.C. was specifically instructed at the ex-parte hearing that trial would commence on May 20, 2025, with or without her retention of counsel.

{¶ 27} J.P.C. cross-appealed, raising the following assignments of error:

I. The trial court erred as a matter of law and abused its discretion in granting the Cross-Appellant protection from the Cross-Appellee for one (1) year.

II. The trial court erred as a matter of law and abused its discretion in failing to designate the minor children as protected parties from the Cross-Appellee.

## D. J.P.C.'s Motion to Dismiss S.T.C.'s Appeal

{¶ 28} On May 23, 2025, J.P.C. filed a motion to dismiss S.T.C.'s appeal as moot. She noted that the DVCPO at issue was effective only until May 12, 2025, and had expired before the May 26, 2025 oral argument in this case.

{¶ 29} S.T.C. opposed the motion, arguing that his appeal was not moot because it may result in collateral legal consequences in Cuyahoga C.P. No. DR 23-3967756 and 8th Dist. Cuyahoga No. 116110, involving a shared parenting plan between S.T.C. and J.P.C ("Parenting Plan Case"). S.T.C. attached to his opposition brief the magistrate's decision and judgment entry from the Parenting Plan Case. He also attached J.P.C.'s brief supporting her appeal of the trial court's decision in the Parenting Plan Case.

{¶ 30} Pertinent to the motion to dismiss this appeal, the documents provided by S.T.C. demonstrate the following events concerning the Parenting Plan Case.

- The Domestic Relations Court modified an existing parenting plan, reducing S.T.C.'s parenting time. In support of this modification, the court evaluated the best interests of the Children under R.C. 3109.04(E)(1) and considered that a DVCPO had been granted in this case.[1]

- Both parties filed objections to the magistrate's modification to the parenting plan. Among them, S.T.C. asserted that the magistrate erred by reducing his parenting time, and J.P.C. posited that the magistrate erred by denying her request to terminate the parenting plan.

- The court adopted the magistrate's findings of fact and modified the parenting plan, ordering S.T.C.'s parenting time to be reduced, although by a lesser amount than the magistrate had recommended.

- Both parties appealed. Mother raised an assignment of error asserting that the trial court erred by not terminating the

---

[1] The magistrate determined that "[S.T.C] has shown to be volatile, including in public, when angered." In support of this conclusion, the magistrate's decision provides, "The uncontroverted facts in which the DVCPO is based show" that S.T.C. "shout[ed] obscenities" at J.P.C. and "pound[ed] on her window at a busy city intersection."

parenting plan, in part because of the DVCPO granted against S.T.C. in the case underlying this appeal. The appeal of the Parenting Plan Case remains pending at the time this opinion was written.

### E. S.T.C.'s Motion to Dismiss J.P.C.'s Cross-Appeal

{¶ 31} In the present case, on June 5, 2026, S.T.C. filed a motion to dismiss J.P.C.'s cross-appeal. He argued that if we found his appeal to be moot because the DVCPO had expired, we should also find J.P.C.'s cross-appeal to be moot. J.P.C. opposed the motion on the basis that she sought, in the proceeding below and on appeal, a five-year DVCPO. J.P.C. argued that her appeal was not moot because less than two years had passed since the trial court issued the DVCPO.

## II. Law and Analysis

### A. Mootness and S.T.C.'s Appeal

{¶ 32} In light of the parties' motions to dismiss, we first address whether the DVCPO's expiration renders moot each assignment of error that S.T.C. raised. Ohio courts may "decide only actual controversies where the judgment can be carried into effect." *Maurent v. Spatny*, 2025-Ohio-5002, ¶ 9, citing *Travis v. Pub. Util. Comm.*, 123 Ohio St. 355, 359 (1931). "[J]udicial power does not extend to moot cases, because when a case becomes moot, there is no longer any controversy for a court to decide." *Id.* at ¶ 10. "A case becomes moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome," that is, when it becomes impossible for a court to grant effectual relief. (Cleaned up.) *Id.* at ¶ 11.

{¶ 33} We do not find, as J.P.C. posits in her motion to dismiss, that S.T.C.'s assignments of error are moot. S.T.C. demonstrated that the DVCPO, though expired, presents collateral legal consequences for him.

{¶ 34} Ohio courts have recognized the collateral-consequences exception to the mootness doctrine. *See, e.g.*, *State v. Golston*, 71 Ohio St.3d 224, 227 (1994) (holding that "an appeal challenging a felony conviction is not moot even if the entire sentence has been satisfied before the matter is heard on appeal," in part because "[t]he Ohio Revised Code contains numerous examples of restrictions imposed upon convicted felons"). In that context,""[a] collateral disability is an adverse legal consequence of a conviction or judgment that survives despite the court's sentence having been satisfied or served."" *State v. Landers*, 2025-Ohio-5143, ¶ 7, quoting *State v. Pizzo*, 2025-Ohio-2790, ¶ 10 (2d Dist.), quoting *In re S.J.K.*, 2007-Ohio-2621, ¶ 10.

{¶ 35} The Ohio Supreme Court has found that "in the absence of demonstrated legal collateral consequences, the collateral-consequences exception to the mootness doctrine does not apply to an expired domestic-violence civil protection order." *Cyran v. Cyran*, 2018-Ohio-24, ¶ 7. "Speculation is insufficient to establish a legally cognizable interest for which a court can order relief using the collateral-consequences exception to the mootness doctrine." *Id.* at ¶ 11.

{¶ 36} This court has recognized that, where continuing legal consequences have been demonstrated – not merely speculated about – an appeal of an expired DVCPO will not be considered moot. *J.M. v. D.H.*, 2020-Ohio-108, ¶ 2 (8th Dist.).

In that case, an expired DVCPO was not moot where appellant "filed with the trial court a notice of continuing legal collateral consequences with an affidavit in support" that addressed the DVCPO's impact on "her ability to serve as a guardian ad litem or court-appointed special advocate." *Id.*

{¶ 37} S.T.C. has demonstrated that the expired DVCPO has subjected him to collateral legal consequences. S.T.C.'s arguments on this point are not merely speculative, as were the appellant's in *Cyran*, because S.T.C. supplemented the record with documents that show he retains a legally cognizable interest in the outcome of this case. The magistrate's decision and judgment entry from the Parenting Plan Case show that the trial court *did* consider the DVCPO underlying this appeal as evidence to support its reduction of S.T.C.'s parenting time, over S.T.C.'s objection.[2] S.T.C. has also shown that J.P.C. asserted on appeal in the Parenting Plan Case that the DVCPO constituted cause to terminate the parenting plan. Unlike in *Cyran*, where collateral consequences were hypothetical, here we find that S.T.C. demonstrated that the expired DVCPO had collateral legal consequences and that his challenges to the grant of the DVCPO are not moot. Consequently, J.P.C.'s motion to dismiss S.T.C.'s appeal is denied.

---

[2] R.C. 3109.04(F)(1) provides that, "in determining a child's best interest in the context of a motion to modify a prior decree, a court 'shall consider all relevant factors.'" *In re G.M.*, 2026-Ohio-841, ¶ 24 (8th Dist.). The statute provides that this consideration includes, "but is not limited to" certain factors set forth by statute. "[E]vidence of physical violence giving rise to a [civil protection order] . . . may be properly considered as other relevant evidence for [a] trial court's custody determination" under R.C. 3109.04. *Sovern v. Sovern*, 2016-Ohio-7542, ¶ 45 (3d Dist.).

{¶ 38} We next address S.T.C.'s assignments of error contesting the DVCPO. In so doing, we address certain assignments of error out of order and together.

**B. DVCPO Elements and Review Standard**

{¶ 39} R.C. 3113.31 sets forth requirements related to the issuance of a DVCPO. "After an ex parte or full hearing, the court may grant any protection order," which may, among other consequences, direct a respondent to take or refrain from taking certain actions. R.C. 3113.31(E)(1). *See* R.C. 3113.31(E)(1)(a)-(k). "The statutory criterion to determine whether or not to grant a . . . protection order pursuant to R.C. 3113.31 is the existence or threatened existence of domestic violence." *R.E.S. v. M.J.M.*, 2025-Ohio-546, ¶ 17 (8th Dist.), quoting *Tyler v. Tyler*, 2016-Ohio-7419, ¶ 18 (2d Dist.). As used in R.C. 3113.31, domestic violence means "[p]lacing another person by the threat of force in fear of imminent serious physical harm." R.C. 3113.31(A)(1)(a)(ii). The person placed in fear of imminent serious physical harm must be a "family or household member." R.C. 3113.31(A)(1)(a). "Family or household member" includes "a former spouse of the respondent." R.C. 3113.31(A)(3)(a)(i).

{¶ 40} To be granted a DVCPO, a petitioner must prove his or her case "by a preponderance of the evidence." *Y.H. v. C.C.*, 2019-Ohio-2922, ¶ 15 (8th Dist.), citing *Croone v. Arif*, 2014-Ohio-5546, ¶ 18 (8th Dist.), citing *Felton v. Felton*, 79 Ohio St.3d 34 (1997). "'"Preponderance of the evidence" means the greater weight of the evidence, or evidence that leads the trier of fact to find that the existence of a

contested fact is more probable than its nonexistence.'" *Id.*, quoting *id.*, quoting *State v. Stumpf*, 32 Ohio St.3d 95, 102 (1987).

{¶ 41} "Explicit threats of domestic violence are not required" to support the grant of a DVCPO; rather, "statements, conduct, and actions, taken with all surrounding facts and circumstances, can constitute a threat." *R.E.S.* at ¶ 17. The "critical inquiry . . . is whether a reasonable person would be placed in fear of imminent . . . serious physical harm." *E.A. v. A.A.*, 2024-Ohio-2807, ¶ 46 (8th Dist.), citing *Strong v. Bauman*, 1999 Ohio App. LEXIS 2272, *4 (2d Dist. May 21, 1999). In an appeal attacking the grant of a DVCPO, this court must determine "whether there was sufficient, credible evidence to support a finding that the respondent engaged in . . . acts of domestic violence." *S.M. v. T.G.*, 2025-Ohio-1448, ¶ 26 (8th Dist.).

### C. S.T.C.'s Second Assignment of Error — the Trial Court's Admission of Evidence Regarding Past Domestic Violence

{¶ 42} With his second assignment of error, S.T.C. asserts that the trial court erred in admitting evidence that he had undertaken prior acts of domestic violence against J.P.C. While S.T.C. does not claim that the trial court violated any specific evidentiary rule, he posits that admitting the evidence in question was an abuse of discretion. S.T.C.'s supports this assignment of error with arguments about the probative value of J.P.C.'s testimony, none of which we find availing. *See* Evid.R. 403(A) (Relevant evidence "is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."). *See also State v. Harris*, 2025-Ohio-2774, ¶ 25

(8th Dist.) ("A determination under Evid.R. 403(A) rests within the discretion of the trial court.").

{¶ 43} In particular, S.T.C. disputes the probative value of the past acts at issue, characterizing them as "remote in time from the incident" that occurred on May 10, 2025, and inclusive of accidental conduct. He argues that there was no evidence corroborating J.P.C.'s testimony regarding his past behavior. He also argues that the Domestic Relations Court issued a shared parenting plan despite being aware of his past conduct, meaning that conduct should not be of concern in this case. We find no merit in this assignment of error.

{¶ 44} "'It is permissible in certain circumstances for a court to consider past behaviors when determining whether there is a present threat of domestic violence.'" *E.A.* at ¶ 39 (8th Dist.), quoting *Tyler v. Tyler*, 2016-Ohio-7419, ¶ 20 (2d Dist.). A petitioner's fear and reasonableness thereof should be determined with reference to a petitioner's history with the respondent. *Id.*, citing *id. See M.D. v. M.D.*, 2018-Ohio-4218, ¶ 74 (8th Dist.) (Trial court erred by limiting testimony to events that occurred during the year before a petition for a DVCPO was filed and, in so doing, "prevented the Petitioner from presenting evidence regarding events that occurred between her and the Respondent that could have helped her establish that her fear of imminent serious physical harm was reasonable.").

{¶ 45} In light of the foregoing, we decline to find, as S.T.C. proposes, that the trial court should have concluded from the fact that the parties have a parenting plan that S.T.C.'s prior acts were not probative of possible future domestic violence.

{¶ 46} We are, likewise, not persuaded that the age of the conduct in question demanded its exclusion. In *E.A.*, the trial court did not err by considering evidence of prior domestic violence despite victim's acknowledgement that no physical altercation had occurred for more than two years prior to hearing. *Id.* at ¶ 15. Similarly, in this case, J.P.C. testified during the 2025 hearing concerning acts that allegedly occurred as recently as three years prior, in 2022. While other incidents addressed in the testimony were more remote in time from the events that gave rise to the DVCPO, we find that the trial court was in the best position to attribute weight to that testimony and that it was not an abuse of discretion to consider it. *See State v. Tegarty*, 2023-Ohio-1369, ¶ 31 (8th Dist.), citing *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus ("The trial court, as finder of fact, can give evidence and testimony the weight it deems appropriate.").

{¶ 47} As for S.T.C.'s contention that no corroborating evidence supported J.P.C.'s testimony about prior domestic violence, we find no error in the trial court's admission of J.P.C.'s testimony. Corroboration was not required. *See Cleveland v. Watson*, 2020-Ohio-3284, ¶ 38 (8th Dist.) ("[A] victim's testimony, alone, if found credible, can provide sufficient evidence to sustain a conviction" in a criminal case, which requires a higher standard of proof than grant of a DVCPO.). In essence, S.T.C. argues J.P.C. was not credible. However, as addressed below, we decline to second-guess any assessment of witness credibility that the trial court made in this matter.

{¶ 48} Finally, S.T.C. argues that admission of testimony about the purportedly accidental 2020 firearm discharge was in error. S.T.C. reasons that J.P.C. agreed that the firearm discharge was not intentional, meaning that testimony about it was prejudicial and irrelevant to the possibility that he would engage in future domestic violence. This argument misstates J.P.C.'s testimony. J.P.C. testified that she had not observed the firearm discharge and explained that after the incident, S.T.C. told her that he had fired the gun accidentally. Notably, the DVCPO in this case arose from a bench trial. It was within the court's purview to decide whether this explanation — which S.T.C. also provided during his testimony — was credible and weigh it accordingly. We do not find that the possibility that S.T.C. accidentally discharged the firearm required the court to exclude testimony about this event. Nor do we find that S.T.C.'s past possession and handling of firearms was an inappropriate topic for the court to consider in evaluating whether a threat of force and reasonable fear of imminent serious physical harm existed in this case.

{¶ 49} In light of the foregoing, we do not find that the court erred in admitting evidence of S.T.C.'s past acts, offered to support J.P.C.'s petition for the DVCPO. Accordingly, S.T.C.'s second assignment of error is overruled.

### D. S.T.C.'s First Assignment of Error — the Trial Court's Grant of the DVCPO

{¶ 50} With his first assignment of error, S.T.C. asserts that the evidence did not support the trial court's grant of the DVCPO. We disagree, finding that a preponderance of sufficient, credible evidence supported the court's decision.

Again, for her petition to succeed, J.P.C. needed to demonstrate that S.T.C. placed her by the threat of force in fear of imminent serious physical harm.

{¶ 51} First, we do not find that the trial court erred in determining that J.P.C. feared imminent serious physical harm. J.P.C. testified that, following her encounter with S.T.C. on May 10, 2025, she was scared for herself and for the safety of the Children. She drove to a police station following the interaction and spoke with Ofc. Keaveney, who testified that J.P.C. was upset and crying. According to J.P.C., her interaction with S.T.C. was "terrifying" and "unexpected" and she "shook" for "three days after."

{¶ 52} We also do not find that the trial court erred in concluding that J.P.C.'s fear of imminent serious physical harm was reasonable under the circumstances. The evidence before the court included S.T.C.'s conduct during the interaction on May 10, 2025, the circumstances leading up to that interaction, and S.T.C.'s past acts. Regarding S.T.C.'s conduct on the day of the incident, J.P.C. testified that S.T.C. started to reach through the car window, which was open at the beginning of their interaction. Further, there was evidence that S.T.C. demonstrated emotional distress with J.P.C. during the Pearl Road interaction. Both parties testified that S.T.C. yelled expletives at J.P.C. Both parties testified that S.T.C. revved his motorcycle's engine while it was stopped alongside J.P.C.'s car. J.P.C. testified that, after she closed her car's window, S.T.C. pounded on it two or three

times with a closed fist. She also testified that S.T.C. scratched his motorcycle against her car, which startled her.[3]

{¶ 53} The court could also have reasonably determined that the circumstances preceding the interaction on Pearl Road indicated that a threat of force existed. The parties testified that S.T.C. pulled his motorcycle up to J.P.C.'s car while the car was stopped at an intersection. The vehicles were traveling in opposite directions, suggesting that— in pulling alongside J.P.C.'s vehicle — S.T.C. stopped in the road for no legitimate purpose. Also supportive of the court's finding that a threat of force existed was evidence that S.T.C. was angry with J.P.C. over her failure to include him in their son's first communion service. *See State v. Lucas*, 2020-Ohio-1602, ¶ 88 (8th Dist.), citing *State v. Thompson*, 2003-Ohio-3939, ¶ 24 (8th Dist.), citing *State v. Nields*, 93 Ohio St.3d 6 (2001) (strained relationship, including evidence of domestic violence, between a defendant and victim is admissible to show motive, intent to harm victim). The testimony of multiple witnesses suggested that, immediately prior to getting on his motorcycle on May 10, 2025, S.T.C. attempted to determine when his son was making his first communion. Despite asking about the first communion, S.T.C. was not invited and J.P.C. was driving away from the ceremony when S.T.C. encountered her. Also, as discussed above, J.P.C. testified about three prior instances in which S.T.C. acted aggressively towards J.P.C. or the Children or put them at risk of physical harm.

---

[3] During her testimony, J.P.C. did not indicate whether she believed that S.T.C. purposefully caused any collision that may have occurred between their vehicles.

{¶ 54} Lastly, we are not persuaded by S.T.C.'s argument that that J.P.C.'s testimony lacked credibility because she altered her recitation of events multiple times between May 10, 2025, and the full hearing. At trial, the factfinder is in the "best position to view the witnesses and observe their demeanor, gestures, and voice inflections that are critical observations in determining the credibility of a witness and his or her testimony." *State v. Sheline*, 2019-Ohio-528, ¶ 100 (8th Dist.). Though S.T.C. claims that J.P.C. provided five different versions of events, many of the purported differences that he identifies – for example, whether S.T.C. did or did not take off a motorcycle helmet that he was wearing while on Pearl Road – do not undermine the trial court's conclusion that J.P.C. demonstrated that a threat of force placed her in reasonable fear of imminent serious physical harm.

{¶ 55} Given the foregoing, we find that sufficient, credible evidence supported the trial court's grant of the DVCPO. Accordingly, S.T.C.'s first assignment of error is overruled.

### E. S.T.C.'s Third Assignment of Error — The Trial Court's Exclusion of GPS Evidence that S.T.C. Attempted to Introduce

{¶ 56} With his third assignment of error, S.T.C. asserts that the trial court erred in excluding GPS evidence that would have shown that he did not follow J.P.C. on his motorcycle after their initial encounter on Pearl Road. Though we find that excluding this evidence amounted to harmless error, we agree that the court's rationale for doing so was contrary to law.

{¶ 57} Evid.R. 901(A) establishes that evidence may be authenticated, as a condition precedent to admissibility, by "evidence sufficient to support a finding

that the matter in question is what its proponent claims." According to Evid.R. 901(B), evidence may be authenticated via "[t]estimony that a matter is what it is claimed to be." Authentication under Evid.R. 901(A) "does not require conclusive proof." *Cleveland v. Greear*, 2020-Ohio-29, ¶ 16 (8th Dist.), citing *State v. Toudle*, 2013-Ohio-1548, ¶ 21 (8th Dist.). This court has upheld the admissibility under Evid.R. 901 of photos taken from a defendant's Facebook page. *State v. Ivery*, 2026-Ohio-2542, ¶ 107-109 (8th Dist.); *State v. Young*, 2022-Ohio-3132, ¶ 68-69 (8th Dist.); *State v. Inkton*, 2016-Ohio-693, ¶ 78, 84 (8th Dist.). In each of the preceding cases, the court found that the testimony of a detective — not of a Facebook employee — was sufficient to support a finding that Facebook photos were what they were claimed to be and admissible evidence.

{¶ 58} The magistrate's ruling that S.T.C. could not authenticate location data recorded by a digital application because he "was not the company" that created or maintained it has no basis in Evid.R. 901. The record also belies the court's conclusion in overruling S.T.C.'s objections to the magistrate's decision that S.T.C. "did not present a witness to properly authenticate the GPS data he was seeking to introduce." S.T.C. was not permitted to explain his knowledge of the exhibit that his attorney attempted to introduce. The magistrate prevented S.T.C.'s attorney from asking questions about that topic upon realizing that the exhibit pertained to the contents of a digital application.

{¶ 59} However, as Civ.R. 61 states, "[N]o error or defect in any ruling or order . . . is ground . . . for vacating, modifying, or otherwise disturbing a judgment

or order, unless refusal to take such action appears to the court inconsistent with substantial justice." The rule further provides, "The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." *See* R.C. 2309.59 ("In every stage of an action, the court shall disregard any error or defect in the pleadings or proceedings which does not affect the substantial rights of the adverse party."). "'Under the concept of harmless error, it is neither prudent nor appropriate for this court to order a trial court to remedy an error that does not affect the outcome of the case; i.e., the appellate court may not reverse the trial court unless a substantive right is affected.'" *Luri v. Republic Servs.*, 2014-Ohio-3817, ¶ 9 (8th Dist.), quoting *Children's Hosp. Med. Ctr. v. S. Lorain Merchants' Assn.*, 2006-Ohio-2407, ¶ 7 (9th Dist.).

{¶ 60} Even if we assume to be true what S.T.C. intended for the GPS evidence to show — that he did not follow J.P.C. from the Pearl Road intersection — as discussed above, sufficient, credible evidence supported the trial court's decision. Again, S.T.C.'s conduct while pulled alongside J.P.C.'s car on May 10, 2025, the circumstances leading up to that interaction, and S.T.C.'s past acts were enough to support the grant of the DVCPO.

{¶ 61} Given the foregoing, we find that the court erred in excluding the GPS evidence for lack of authentication, but do not find that doing so affected the outcome of this case.[4]  Accordingly, S.T.C.'s third assignment of error is overruled.

### F. S.T.C.'s Fourth Assignment of Error — The Trial Court's Grant of a One-Week Continuance

{¶ 62} With his fourth assignment of error, S.T.C. asserts that the trial court erred in continuing the full hearing on the DVCPO from May 20, 2025, to May 27, 2025.  We disagree.

{¶ 63} "'A trial court has the discretion to schedule and continue hearings.'" *Broadview Hts. v. Vukotic*, 2025-Ohio-5855, ¶ 26 (8th Dist.), citing *Calhoun v. Calhoun*, 2010-Ohio-2347, ¶ 24 (8th Dist.).  "In so doing '[t]he trial court must balance its own interests of maintaining its docket with the potential prejudice to the parties.'" *Id.*, citing *id.*  Also, in a case involving a DVCPO, "the court may grant a continuance of the full hearing to a reasonable time determined by the court" where "continuance is needed to allow a party to obtain counsel." R.C. 3113.313(D)(2)(a)(iii).

{¶ 64} We find no merit in S.T.C.'s assertion that the court erred in continuing the full hearing on the DVCPO by one week.  As R.C. 3113.313(D)(2)(a)(iii) permits, the court continued the case to allow J.P.C. to retain legal counsel.  S.T.C. provides no support for his accusation that "J.P.C.'s conduct [in seeking a continuance to retain a lawyer] was dilatory, purposeful and

---

[4] We make no decision about any other grounds for admitting or excluding the evidence at issue.

contrived." Further, S.T.C. does not claim that the continuance harmed his ability to present his case.

{¶ 65} In his reply brief, S.T.C. declares that "delay of even a day harms a Respondent subject to an Ex Parte DVCPO." We are not persuaded. While a party subject to an ex parte DVCPO that was issued contrary to law may be harmed by an unreasonable delay of his or her opportunity to present a case at a full hearing, as discussed above, we do not find that the DVCPO that S.T.C. contests was erroneously granted. In light of the foregoing, we do not find that the court abused its discretion in granting J.P.C.'s request for a one-week continuance.

{¶ 66} Accordingly, assignment of error No. 4 is overruled.

### G. Mootness and J.P.C.'s Cross-Appeal

{¶ 67} We next address J.P.C.'s cross-appeal. With her first cross-assignment of error, J.P.C. challenges the duration of the DVCPO. She argues that a five-year, rather than a one-year, DVCPO was appropriate. With her second cross-assignment of error, J.P.C. asserts that the DVCPO should have covered the Children.

{¶ 68} As an initial matter, we again note that S.T.C. moved to dismiss J.P.C.'s appeal, arguing that the issues it raises are moot. We do not agree with this argument as relates to J.P.C.'s first assignment of error about the duration of the DVCPO. "Where [a protection] order may have expired during the pendency of an appeal by a petitioner challenging the duration of the order, the appeal is not moot." *Elmurr v. Makdessi*, 2019-Ohio-1437, ¶ 19 (8th Dist.). J.P.C. sought a five-year

DVCPO, and less than two years have passed since the issuance of the one-year DVCPO that she contests. As such, J.P.C. has a legally cognizable interest in the outcome of this case. Consequently, we deny S.T.C.'s motion to dismiss.

### H. J.P.C.'s First-Cross Assignment of Error — The Trial Court's Decision to Issue a One-Year, Rather Than a Five-Year, DVCPO

{¶ 69} We next address the merits of J.P.C.'s first cross-assignment of error. Courts are "authorized 'to craft protection orders that are tailored to the particular circumstances.'" *Elmurr* at ¶ 15, quoting *M.D.*, 2018-Ohio-4218, at ¶ 45 (8th Dist.). "[C]hallenges to the scope of a protection order are reviewed for abuse of discretion." *Elmurr* at ¶ 15. A DVCPO remains effective until a date certain "not later than five years from the date of its issuance or approval." R.C. 3113.31(E)(3)(a).

{¶ 70} In support of her challenge to the duration of the DVCPO, J.P.C. attempts to compare this case to *E.A.*, 2024-Ohio-2807 (8th Dist.), in which this court affirmed a five-year DVCPO. The *E.A.* Court noted that, at hearing, the petitioner identified "specific instances of physical abuse." *Id.* at ¶ 51. This included testimony that petitioner's husband "pinned [her] up against the kitchen counter," "dug his fingers into the back of [her] hand," "put his hands around [her] throat," "grabbed [her] by her head, and shoved [her] in the closet." *Id.* at ¶ 6-7.

{¶ 71} We do not find that the court abused its discretion in issuing a one-year DVCPO here. Unlike in *E.A.*, there was no evidence that S.T.C. came in contact with J.P.C.'s person on May 10, 2025. For their entire interaction on Pearl Road, S.T.C. was on his motorcycle and J.P.C. was in her car. The only bodily contact that J.P.C. described was between S.T.C.'s closed fist and her closed car window. She

testified that S.T.C. pounded on the window two or three times. J.P.C. also denied that S.T.C. made an explicit verbal threat to physically harm her. She denied that she saw a weapon during the interaction with S.T.C.

{¶ 72} Further, J.P.C.'s testimony about S.T.C.'s conduct during the former couple's marriage did not include allegations of harmful physical contact or verbal threats of physical harm. We acknowledge that J.P.C. testified about incidents in which she could have been physically harmed because of S.T.C.'s behavior, namely, when he discharged a firearm in their home and when he threw his cell phone. However, S.T.C. testified that the firearm discharge occurred accidentally — which J.P.C. did not dispute in her testimony — while J.P.C. was on another floor of their home. The gunfire and thrown cell phone each damaged a wall but did not hit or injure J.P.C. The most recent of these events occurred in 2020, approximately five years before the incident that gave rise to S.T.C.'s petition for the DVCPO at issue. In light of the foregoing, we do not find that the trial court's decision to issue a one-year DVCPO, rather than the five-year DVCPO requested by J.P.C., amounted to an abuse of discretion.

{¶ 73} Accordingly, J.P.C.'s first cross-assignment of error is overruled.

## I. J.P.C.'s Second Cross-Assignment of Error – The Trial Court's Decision Not to Protect the Children Under the DVCPO

{¶ 74} Having overruled J.P.C.'s first cross-assignment of error, we find that J.P.C.'s second assignment of error — that the DVCPO should have covered the Children — is moot. Because we find that the trial court did not abuse its discretion in determining that the DVCPO would remain effective for a one-year period, which

has elapsed, modifying the DVCPO to cover the Children would be of no consequence.

{¶ 75} Accordingly, J.P.C.'s second cross-assignment of error is overruled.

{¶ 76} Judgment affirmed.

It is ordered that appellee and appellant share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, domestic relations division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LISA B. FORBES, JUDGE

MICHELLE J. SHEEHAN, A.J., and
EMANUELLA D. GROVES, J., CONCUR